FILED
2005 Apr-29  AM 11:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **AUDREY JANE BROWNING,**<br>**individually and as representative**<br>**of the Estate of A.C. Browning,**<br><br>    **Plaintiff,**<br><br>**vs.**<br><br>**FORTIS BENEFITS**<br>**INSURANCE COMPANY;**<br>**ELECTRONIC BUSINESS**<br>**EQUIPMENT, INC.;**<br>**GEORGE NELSON;**<br><br>    **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>**Civil Action No. CV-00-S-1654-S** |

## MEMORANDUM OPINION

Plaintiff, Audrey Jane Browning, asserts claims against defendants Fortis Benefits Insurance Company, Electronic Business Equipment, Inc., and George Nelson, who is the president and chief executive officer of Electronic Business Equipment. Plaintiff's claims are based upon the denial of life insurance benefits to which, she alleges, she was entitled following the death of her husband, A.C. Browning, who was an employee of Electronic Business Equipment prior to his death.

This action was commenced in the Circuit Court of Jefferson County, Alabama, Bessemer Division,[1] but defendant Fortis removed the action with the consent of the

---

[1] Doc. no. 1 (Notice of Removal), Ex. A.

remaining defendants.[2]  Fortis filed a motion to dismiss, contending that plaintiff's state law claims were preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and that plaintiff had failed to exhaust administrative remedies.[3]  This court denied the motion to dismiss without prejudice, and stayed the action for a period of sixty days, to allow plaintiff an opportunity to exhaust her administrative remedies.[4]  After doing so, plaintiff filed an amended complaint asserting a claim for breach of fiduciary duty under the provisions of ERISA.[5]

All defendants subsequently filed motions for summary judgment,[6] each of which was denied.[7]  Following unsuccessful mediation, a pretrial conference was held, during which the parties requested the opportunity to submit the issues of the controversy for decision on the basis of stipulated facts and briefs.   Upon consideration of the stipulations[8] and briefs,[9] therefore, the court makes the following findings of fact and enters conclusions of law.   For completeness, the parties'

---

[2] Doc. nos. 1 (Notice of Removal) & 2 (Consent to Removal).

[3] Doc. no. 3 (Motion to Dismiss).

[4] Doc. no. 6.

[5] Doc. no. 9.

[6] Doc. nos. 25 & 27.

[7] Doc. no. 36.

[8] Doc. nos. 43 (Statement of Stipulated Facts) and 44 (Notice of Change in Stipulated Facts).

[9] Doc. nos. 45-49 & 52.

stipulations have been supplemented by the court.

## I.  FACTS

1.      Beginning on June 1, 1993, Fortis Benefits Insurance Company ("Fortis") provided group term life insurance to Electronic Business Equipment, Inc. ("EBE"), for the benefit of its employees, and, as a part of EBE's employee welfare benefits plan (the "EBE Plan").

2.      Plaintiff's husband, A.C. Browning ("Mr. Browning" or "Browning"), was employed by EBE, and on November 1, 1994, he became eligible for group life insurance in the amount of $75,000.  Mr. Browning's job duties included servicing, repairing, and maintaining electronic business machines.  EBE and George Nelson, who was president and chief executive officer of EBE ("Nelson"), received notice that Browning was covered by the group life insurance policy, subject to its limitations and requirements, on December 16, 1994.

2.      The contract of insurance between EBE and Fortis contained the following, relevant provisions:

**GENERAL DEFINITIONS**

"Active Work" means actively at work on a full-time basis for the Participating Employer or an Associated Company at the person's usual place of business.
. . . .

"Eligible Class" means the category of persons eligible for insurance

under the Policy.  This category is based on conditions pertaining to employment or membership in a group.  The Eligible Classes are shown in the Participating Employer's application.

. . . .

"Full Time" means a regular work week consisting of at least 30 hours of work (unless otherwise provided in the Participating Employer's application).

. . . .

"Total Disability" and "Totally Disabled" mean disability resulting from bodily injury or a physical or mental disease.  The disability must wholly prevent the Person Insured from engaging in any and every gainful occupation or employment for which the person is or becomes reasonably fitted by education, training, or experience.[10]

**Persons Eligible**

To be eligible for insurance, a person must be a member of an Eligible Class.  The person must also complete an applicable period of continuous service (Service Requirement) with the Participating Employer (or any Associated Company) and must furnish, at his or her own expense, Satisfactory Evidence of Insurability, when applicable (Evidence Requirement).

**Eligible Classes**

Each active, Full-Time employee of the Participating Employer (or any Associated Company) working in the United States of America, except any temporary or seasonal workers . . . .

. . . .

---

[10] Doc. no. 30 (EBE's evidentiary submissions), Ex. C (ex. 2 "Endorsements and Amendments") at "FORTIS-0022."

**Termination of a Person's Insurance**

The insurance of a Person Insured will terminate on the earliest of the following dates listed below. They will not apply to any person whose coverage is being continued under the **Disability Benefit** provision in the **LIFE INSURANCE COVERAGE FOR THE PERSON INSURED** provision of the Policy.

1.    The date the Policy is terminated.

2.    The date the Policy or Participating Employer's application is amended to terminate the insurance for the class of persons to which the person belongs.

3.    The date the person is no longer in an Eligible Class.

4.    The date the Person Insured stops Active Work.

. . . .

**Continuance of Insurance**

If a person is no longer in an Eligible Class, because he or she is not able to perform Active Work for a reason listed in the Table of Continuance, the Participating Employer may continue the person's insurance. The insurance cannot be continued for more than the applicable Maximum Period set forth in the table.

Any continuance by the Participating Employer must be based on a uniform policy which precludes individual selection.

<u>Table of Continuance</u>

| Reason for Cessation of <u>Active Work</u> | Maximum Period of <u>Continuance</u> |
|---|---|
| Injury, Sickness or Pregnancy | 12 months following the date |

5

|                                | Active Work ceased          |
|--------------------------------|-----------------------------|
| Lay-off, Leave of Absence      | 3 months following the date |
| or Transfer to a Part-Time Basis | Active Work ceased        |

If insurance is not continued, only a limited time is available to apply for a conversion policy through the Conversion Privilege provision of the Policy.

. . . .

**Conversion Privilege**

If all, or part of, a person's Life Insurance terminates under the following circumstances, he or she can convert the terminated insurance to a Conversion Policy.  Satisfactory Evidence of Insurability will not be required.

1.  Conversion is available if insurance terminates because:

      (a)    the person is no longer in an Eligible Class,

      (b)    of a change in age or other status, or

      (c)    the Participating Employer's Life Insurance under This Trust is terminated because there is only one Person Insured under the Life Insurance under This Coverage.

**How to Convert**

Within 31 days following the date the insurance terminated the person must:

    (1)    apply for the Conversion Policy in a form acceptable to Us, and

    (2)    pay the premium required by the Conversion Policy.  The premium will be at Our then customary rate for the class of risk to which the person then belongs and his or her age, nearest birthday.

6

The Conversion Policy will take effect at the end of the 31 day period.

**Death Benefit During Conversion Period**

A death benefit will be paid to the Person Insured's Beneficiary if:

> (i)    the Person Insured should die within the 31 day period after insurance has terminated, and

> (ii)    that person was entitled to apply for a Conversion Policy.

The death benefit will be the maximum amount of Life Insurance that the person could have converted.  This amount will be paid whether or not the person applied for a Conversion Policy or paid the first premium.[11]

3.    Fortis presented no evidence that a copy of the group life insurance policy was sent to either EBE or Nelson.

4.    Prior to July 31, 1997, Browning worked an average of forty hours a week at EBE's place of business, located at 3601 Sixth Avenue South in Birmingham, Alabama.  In addition to the hours spent working at his employer's office, Browning was "on call" twenty-four hours a day, Monday through Friday.

5.    Beginning on July 31, 1997, however, Browning ceased working forty hours a week at his employer's place of business, because he had been diagnosed with an inoperable brain tumor.  Instead, Browning thereafter worked only two to three

---

[11] Doc. no. 30 (Electronic Business Equipment's evidentiary submission), Ex. C(2) at "FORTIS-0001" to "FORTIS-0065"; doc. no. 32 (Plaintiff's evidentiary submission), Tab A, "Certificate of Group Insurance," at "FORTIS-0098 " to "FORTIS-0141."  *See also* doc. no. 43 (Statement of Stipulated Facts).

hours each day, but remained "on call" twenty-four hours a day, Monday through Friday. In addition to the reduction in the number of hours actually worked at his employer's place of business, Browning's compensation was modified. Rather than being paid a salary, EBE provided compensation in the form of paying the premiums for Browning's life and health insurance coverage.

6.      Following the change in the number of hours Browning actually worked, neither he nor Nelson (or anyone acting on EBE's behalf) submitted any forms or documents requesting that Fortis convert Browning's group life insurance coverage to an individual life insurance policy. As a consequence, Fortis did not send an application to convert the insurance policy to Browning.

7.      Browning died on October 3, 1998. Until the date of Browning's death, Fortis continued to send invoices for the group life insurance policy premiums to EBE for payment, and EBE paid all premiums.

8.      Following Browning's death, Nelson submitted a claim for life insurance benefits on behalf of Browning's widow, plaintiff herein, on October 26, 1998. The claim initially was denied by Fortis on the ground that Browning was not a member of an eligible class of EBE employees, because he had ceased to be "actively working" as defined by the insurance policy prior to his death.

9.      Nelson thereafter provided an affidavit to Fortis in further support of the

claim, in which he stated:

Prior to being diagnosed with a terminal illness and before the payroll period ending July 31, 1997, A.C. Browning, Jr., was actively employed on a full-time basis with Electronic Business Equipment, Inc., with job duties including, but not limited to, the service of electronic business equipment, both on and away from the premises of Electronic Business Equipment, Inc., and providing, via telephone, to the customers thereof certain information pertaining to the service and use of such equipment, performed at both the locations of Electronic Business Equipment, Inc., and the personal residence of A.C. Browning, Jr., all of which were conducted in the customary and ordinary course of business thereof.

Subsequent to said diagnosis and following the payroll period ending July 31, 1997, but prior to July, 1998, when his terminal illness or disability prevented him from engaging in gainful employment with Electronic Business Equipment, Inc., A.C. Browning, Jr., actively worked on a full-time basis on the premises thereof for approximately two to three (2-3) hours per day for five (5) days per week, performing service and informational functions on the premises of Electronic Business Equipment, Inc., and was further required to be "on-call" at home for twenty-four (24) hours per day for five (5) days per week, providing, via telephone, to the customers thereof certain service and use information, including, but not limited to, the provision of cash register program information, all of which were conducted from the commencement of the aforementioned period through July, 1998, and all performed in the customary and ordinary course of business thereof. A.C. Browning, Jr., eventually succumbed to the terminal illness and died on or about October 3, 1998.

In consideration of his services subsequent to the payroll period ending July 31, 1997, through July, 1998, Electronic Business Equipment, Inc., agreed to and in fact paid on behalf of A.C. Browning, Jr., the life and health insurance premiums of said employee for the remainder of his life.  Said life insurance was acquired through Blue Cross/Blue Shield of Alabama, Inc., but provided by Fortis Benefits Insurance Company, while said health insurance was obtained through,

and provided by, Blue Cross/Blue Shield of Alabama, Inc.  Both Blue Cross/Blue Shield of Alabama, Inc., and Fortis Benefits Insurance Company accepted premiums therefor from Electronic Business Equipment, Inc., through November, 1998.

While A.C. Browning, Jr., was not technically paid "wages" for his services through the payroll department of Electronic Business Equipment, Inc., during the aforementioned period, he was nonetheless still a full-time, actively working, employee therein, based upon both his work on the premises thereof and his "on-call" status, both on and away therefrom, all of which were conducted in the customary and ordinary course of business thereof.  Furthermore, the name of A.C. Browning, Jr., was still contained on both the payroll, insurance and employment lists of Electronic Business Equipment, Inc., until the time of his death.

Moreover, prior to the death of A.C. Browning, Jr., on or about October 3, 1998, neither myself nor any employee of Electronic Business Equipment, Inc., responsible for insurance matters therein, received or had actual or constructive knowledge of the contents of the policy of life insurance or the certificates to be given by said employer to the insured employees, provided by Fortis Benefits Insurance Company, which was applicable to said employees thereof and particularly with respect to A.C. Browning, Jr.  My first and initial notice of the Conversion Provisions contained in the subject policy was when Fortis Benefits Insurance Company, following the claim filed by  A.C. Browning, Jr., apprised me of the applicability of said Conversion Provisions, the lack of coverage and denied said claim.[12]

10.   On October 11, 1999, Fortis again denied the claim, explaining that

Nelson's "affidavit is not sufficient proof that Mr. Browning was eligible for

insurance coverage at the time of his death, under the terms of the policy.  Only full-

time employees, working at least 30 hours per week at the usual place of business are

---

[12] Doc. no. 30 (EBE's evidentiary submission), Ex. C at ex. 1 (Nelson affidavit).

eligible for life insurance coverage." On December 1, 1999, Fortis advised Nelson's

counsel that

> Mr. Browning's insurance ended when he no longer met the eligibility
> requirements of the policy.  No provisions exist for continuance of
> insurance for on-call employees, part-time employees or retirees.
> Neither Mr. Browning nor his employer filed a claim for the Disability
> Benefit, which could have continued the insurance coverage for one
> year.  Had Mr. Browning been approved for the Disability Benefit, not
> only would his premium have been waived, he would have been notified
> of his right to conversion at the end of the one-year continuance.[13]

11.    The parties also stipulated to the following:

> Fortis's corporate representative, Ms. Terri Steen, admitted in deposition
> that, under the facts of this particular claim, Mr. Browning would not
> have been permitted in any event to take advantage of the conversion
> option in the subject policy as the policy would not have been
> convertible.[14]  Additionally, Browning would not have qualified for any
> one year or other extension of coverage from the date Fortis maintains
> his "disability" began:  *i.e.*, July 31, 1997.[15]

12.    The claim for life insurance proceeds was administered and denied in

accordance with the documents contained in the administrative file.  Following the

denial, no premiums were refunded to EBE.

13.    Plaintiff has exhausted her administrative remedies.

---

[13] Doc. no. 32 (plaintiff's evidentiary submission), Ex. A at "FORTIS-0074" (emphasis supplied).

[14] Although plaintiff stipulated to this fact, upon review of Terri Steen's deposition, the court concludes that these statements do not accurately reflect the entirety of her testimony, for reasons that are discussed in note 21 and accompanying text *infra*.

[15] Doc. no. 43 (Statement of Stipulated Facts), ¶ 12.

## II. DISCUSSION

**A.    Defendants' Liability for Violation of ERISA Notice Requirements Under 29 U.S.C. § 1024(b)**

Plaintiff does not challenge the decision of Fortis denying life insurance benefits; instead, she asserts that Fortis, EBE, Nelson, or all of the foregoing, breached the duty imposed by ERISA to provide plan participants with a copy of the employee welfare benefit plan at issue.[16]  Plaintiff argues that, had her husband received a copy of the plan, he would have known to take additional measures to extend (or convert) his life insurance coverage.

"ERISA protects employee pensions and other benefits by providing insurance . . . specifying certain plan characteristics in detail . . . and by setting forth certain fiduciary duties applicable to the management of both pension and nonpension plan benefit plans."  *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996).

In relevant part, 29 U.S.C. § 1024(b) requires a plan "administrator" to "furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description" within "90 days after he becomes a participant, or (in the case of a beneficiary) within 90 days after he first receives benefits."  The term "administrator" means:

> **(i)** the person  specifically  so  designated  by  the  terms  of  the

---

[16] *See* doc. no. 9 (Plaintiff's First Amended Complaint).

instrument under which the plan is operated;

    **(ii)** if an administrator is not so designated, the plan sponsor; or

    **(iii)** in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

29 U.S.C. § 1002(16)(A).

EBE does not dispute that it was the "administrator" of the EBE plan,[17] or that it failed to furnish a copy of the summary plan description to Mr. Browning within the time period allotted under 29 U.S.C. § 1024(b).  Even so, EBE argues that plaintiff may not seek relief for these violations under ERISA.  This court reluctantly agrees.

### 1.    The employer (EBE)

Plaintiff claims that she may bring a cause of action under 29 U.S.C. § 1132(a)(1)(A) — the pertinent part of which provides that "[a] civil action may be brought . . . by a participant or beneficiary . . . for the relief provided for in subsection (c) of this section."  Subsection (c) in turn provides that any "administrator" who

---

[17] According to plaintiff,

EBE applied for group insurance in May of 1993.  The application was signed by George Nelson as President of the EBE.  Ultimately, the application was approved on June 1, 1993.  The application, under the section with heading "Notice to Applicants," states in sub-paragraph (f) that "the employer is the plan administrator unless otherwise noted.  Thus, EBE should be considered an administrator of the plan because it is the person 'specifically so designated by the terms of the instrument under which the plan is operated.'"

Doc. no. 45 (Brief in Support of Plaintiff's ERISA Claims) at 2-3.

fails or refuses to comply with *a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary* . . . may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day *from the date of such failure or refusal.*

29 U.S.C. § 1132(c)(1)(B) (emphasis supplied).

The First Circuit, facing issues similar to the ones presented by this case, explained that:

ERISA contains specific sections requiring plan administrators to provide participants with information, including a summary plan description. 29 U.S.C. §§ 1021, 1024. Plan participants have a cause of action under 29 U.S.C. § 1132(a)(1) against plan administrators who fail to comply *with a request to provide any such information.* Section 1132(c)(1)(B) specifies the relief available to such plaintiffs, allowing for penalties of $100 per day and "such other relief as [the court] deems proper." These penalties are limited, however, as the court may only order relief if the plan administrator fails to provide the appropriate documentation within thirty days *after a participant requests it. Id.*

*Watson v. Deaconess Waltham Hospital*, 298 F.3d 102, 112 (1st Cir. 2002) (emphasis added) (alteration in original).

Here, while EBE admittedly failed to provide plan documents to Browning, there is no evidence that either Browning or plaintiff even *requested* a copy of the group life insurance policy. Hence, the penalty provisions of § 1132(c)(1)(B) are inapplicable. *See Welsh v. GTE Service Corporation*, 866 F. Supp. 1420, 1425 (N.D. Ga. 1994) (holding that "liability cannot be imposed under section [1132(c)] *unless and until* a participant *requests information from the administrator* and the

14

administrator fails to comply within 30 days") (emphasis supplied) (citing *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1167 (3rd Cir. 1990)).

In the alternative, plaintiff claims that she may bring a cause of action under 29 U.S.C. § 1132(a)(1)(B). This provision provides that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Unfortunately for plaintiff, courts have "taken a narrow approach towards ERISA plaintiffs who attempt to assert procedural notice and disclosure violations outside of the context of § 1132(c)." *Watson*, 298 F.3d at 113. As the First Circuit observed in *Watson*, "in the context of a § 1132(a)(1)(B) denial of benefits claim . . . ERISA's notice requirements are not meant to create a system of strict liability for formal notice failures." *Id.* (citations and internal quotation marks omitted). "Technical violations of ERISA's notice provisions generally do not give rise to substantive remedies [under § 1132(a)(1)(B)] unless there are some exceptional circumstances, such as bad faith, active concealment, or fraud." *Id.* (collecting cases). Plaintiff has not presented evidence of such "exceptional circumstances" and, therefore, her argument that she may seek relief under § 1132(a)(1)(B) is unavailing.

**2.     The insurance provider (Fortis) and EBE president (George Nelson)**

Neither Fortis nor George Nelson were "administrators" of the EBE plan. Therefore, they were not subject to the notice and disclosure requirements in 29 U.S.C. § 1024(b). Even if Fortis and George Nelson were subject to such requirements,[18] plaintiff may not seek relief under 29 U.S.C. § 1132(a)(1)(A) or (B) for the reasons discussed above.

## B.    Defendants' Liability for Breach of Fiduciary Duty to Inform

Plaintiff also claims that EBE, Nelson, Fortis, or all of them, breached a fiduciary duty to her husband: *i.e.*, to inform him that changes to his work schedule would result in the termination of his life insurance benefits.[19]

A breach of fiduciary duty claim is separate and distinct from a claim based upon a violation of ERISA's notice requirements. *See Varity Corp.*, 516 U.S. at 504 ("If the fiduciary duty applied to nothing more than activities already controlled by other specific legal duties, it would serve no purpose."); *see also Jordan v. Federal Express Corporation*, 116 F.3d 1005, 1014 (3rd Cir. 1997) ("[W]e evaluate fiduciary duty to inform claims differently from violations of ERISA's reporting and disclosure requirements."). "[F]or breach of fiduciary duty violations, Congress has left it to the courts to 'develop a federal common law of rights and obligations under ERISA-

---

[18] Plaintiff argues that Fortis and George Nelson were "fiduciaries" to Mr. Browning, and therefore, they were subject to the notice and disclosure requirements set out in 29 U.S.C. § 1024(b). *See* doc. no. 45 (Brief in Support of Plaintiff's ERISA claims) at 5-6.

[19] *See* doc. no. 9 (Plaintiff's First Amended Complaint).

regulated plans.'" *Jordan*, 116 F.3d at 1013.  "This has been done through the employment of trust principles and the creation of federal common law."  *Id.*

### 1.     The employer (EBE)

The crucial event with respect to Browning's life insurance coverage occurred on July 31, 1997, when his work schedule was reduced from forty hours a week to two or three hours a day.  Under the terms of the group life insurance policy, persons eligible for coverage included only those who were "active, Full-Time" employees. "Active work" was defined as "actively at work on a full-time basis for the Participating Employer . . . at the person's usual place of business."  The policy defined "Full Time" as "a regular work week consisting of *at least 30 hours of work*." Accordingly, Browning's coverage was due to be terminated on July 31, 1997, unless he met the criteria for continuing or converting the insurance.

The policy provided that, where the reason for cessation of "active work" was "sickness," insurance coverage could be *continued* for a maximum period of twelve months following the date active work ceased — *i.e.,* in this case, until July 31, 1998. Even under this provision, however, Browning would not have been covered on the date of his death — *i.e.,* October 3, 1998, two months outside the period of continuation.

Likewise, the disability provisions of the policy are inapplicable, due to the fact

that Browning continued to "work" for EBE and, as a consequence, did not meet the

policy's definition of "Totally Disabled."

Despite the foregoing facts, the policy contained a "Conversion Privilege"

which provided that:

> If all, or part of, a person's Life Insurance terminates under the following circumstances, he or she can convert the terminated insurance to a Conversion Policy.  Satisfactory Evidence of Insurability will not be required.
>
> 1.    Conversion is available if insurance terminates because:
>
>     (a)    the person is no longer in an Eligible Class,
>
>     (b)    of a change in age or other status,
>
>     (c)    the Participating Employer's Life Insurance under This Trust is terminated because there is only one Person Insured under the Life Insurance under This Coverage.[20]

A person whose insurance otherwise would be terminated was required to apply for

a conversion policy within 31 days following the date on which group insurance

coverage terminated.  Browning did not apply for such a policy.

Terri Steen, who occupied the position of "Life Claims Analyst" with Fortis,

testified as follows:

> Q.    [W]ould there have been anything Mr. Browning could have done to keep his insurance in force and effect up through the date of his

---

[20] Doc. no. 32 (Plaintiff's evidentiary submission), Tab A, "Certificate of Group Insurance," at "FORTIS-0125" to "FORTIS-0126."  *See also* doc. no. 43 (Statement of Stipulated Facts) at 3.

death, October, 1998?

A.      Based on the July 31st, '97, date last worked, there is a 12-month continuance period in the policy that an employee can keep their insurance if they are off due to illness and the employer can pay their premiums and they are still covered.

Q.      For one year?

A.      Yeah, 12 months.

Q.      Then was there anything that he could have done under this policy after that 12 months which would have run out in July of '98 to continue his coverage?

A.      He would have had the 31 days to convert it to an individual policy.

Q.      So by the end of August, 1998, if he had converted it to an individual policy, would his — and assuming he continued to pay his premiums — would his coverage have continued through the date of his death?

A.      *Yes, if he had converted and paid the individual premiums.*[21]

. . . .

Q.      And as far as you know, was Mr. Browning entitled to apply for a conversion of this policy to an individual policy?

A.      Yes.

Q.      Would he have had to go back through underwriting?

A.      No.

---

[21] Doc. no. 30 (EBE's evidentiary submission), Ex. B (deposition of Terri Steen), at 28-29 (emphasis supplied).

Q.     It would have just been converted to an individual policy status quo?

A.     Yes, there was no evidence of insurability required.[22]

In view of the foregoing, it is clear that Browning would have been able to maintain insurance coverage until the date of his death, if he had known of his right

---

[22] *Id.* at 31.  Despite this deposition testimony, the parties stipulated that "under the facts of this particular claim, Browning would not have been permitted in any event to take advantage of the conversion option."  *See* text accompanying note 14 *supra*.  This stipulation apparently was based on the following deposition testimony given by Ms. Steen:

Q.     Now, if the facts as Mr. Nelson provided to you [in his September 23, 1999 affidavit] were true, that being that Mr. Browning was in fact working 30 plus hours a week, actively working, then Mr. Browning would still have been in an eligible class at the time of his death; is that right?

A.     If he had been actively at work working 30 hours a week.

Q.     Those are the facts as Mr. Nelson provided them to Fortis in his affidavit; is that correct?

A.     I don't recall exactly what's in the affidavit.

Q.     Assuming Mr. Nelson will testify to that effect, that he was in fact, Mr. Browning, working actively full time, at least 30 hours a week, then that would mean he was still in the eligible class; is that correct?

A.     Yes.

Q.     And if that's the case, he wouldn't have been entitled to covert his policy; is that right?

A.     Correct.

Doc. no. 30 (EBE's evidentiary submission), Ex. B (deposition of Terri Steen), at 80-81.  Of course, the premise that Mr. Browning worked at least 30 hours a week during his illness is false.  Indeed, if Browning had continued to work that amount, his insurance would not have been terminated, because he would have remained in active, full-time employment under the terms of the EBE plan.  The court accordingly declines to adopt the stipulated fact that "Browning would not have been permitted in any event to take advantage of the conversion option."

to exercise the conversion privilege upon his change in status.  Neither EBE nor
Nelson informed Browning of this opportunity, however.  Instead, EBE (acting
through Nelson) promised to "compensate" Browning for the limited "work" he
performed after discovery of his inoperable brain tumor by continuing to pay
insurance premiums on his behalf.  However, neither Nelson nor any other EBE
employee consulted Fortis to determine whether Browning would retain his insurance
benefits under that compensation scheme.

### a.   Did EBE act as Mr. Browning's "fiduciary"?

"[A] person is a fiduciary with respect to a plan to the extent . . . he exercises
any discretionary authority or discretionary control respecting management of such
plan or . . . he has any discretionary authority or discretionary responsibility in the
administration of such plan."  29 U.S.C. § 1002(21)(A).  *See also Varity Corp.*, 516
U.S. at 498 ("fiduciary status" defined by 29 U.S.C. § 1002(21)(A)).

In *Varity*, the employer was the "administrator" of a self-funded employee
welfare benefit plan protected under ERISA.  516 U.S. at 492.  Former employees
alleged that the employer deceitfully induced them to transfer to a new subsidiary, and
to a new employee benefit plan, knowing that the new subsidiary would fail.  *Id.* at
493-94. The employer had disseminated written and visual materials to the employees
— for example, answers to "frequently asked questions" regarding the new benefit

plan, and videotapes regarding the plan — to induce the employees to transfer coverage. *Id.* at 499-500.  The Supreme Court concluded that the employer acted as a fiduciary to its employees when it made these representations.  The Court reasoned that, under the law of trusts, "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation," and, "offer[ing] beneficiaries detailed plan information in order to help them decide whether to remain with the plan," constituted "fiduciary acts" under ERISA.  *Id.* at 502-03.  The Court also observed that the written and visual materials disseminated to the employees had come "from those within the firm who had authority to communicate as fiduciaries with plan beneficiaries."  *Id.* at 503.  Finally, the Court stated that

> reasonable employees, in the circumstances found by the District Court, could have thought that [the employer] was communicating with them *both* in its capacity as employer *and* in its capacity as plan administrator. Reasonable employees might not have distinguished consciously between the two roles.  But they would have known that the employer was their plan's administrator and had expert knowledge about how their plan worked.  The central conclusion ("your benefits are secure") could well have drawn strength from their awareness of that expertise, and one could reasonably believe that the employer, aware of the importance of the matter, so intended.

*Id*. (emphasis in original).  The Court concluded that "the factual context in which the statements were made, combined with the plan-related nature of the activity, engaged in by those who had plan-related authority to do so, together provide sufficient

22

support for the . . . legal conclusion that [the employer] was acting as a fiduciary." *Id.*

As previously observed, EBE was the plan "administrator."  Sometime on or before July 31, 1997, EBE (acting through its president and CEO, Nelson) communicated to Mr. Browning that he would continue to receive his insurance benefits despite his reduced work schedule.  Certainly, EBE did not give Browning "detailed information" about his policy, as did the employer in *Varity*.  Even so, EBE signaled that it understood the nuances of that plan by offering the continuation of Browning's insurance benefits as his *sole* means of compensation. The whole point of modifying Browning's employment contract was to allow him to "make an informed choice about continued participation" in the group insurance plan.

Furthermore, a reasonable person in Browning's position would have believed that EBE was acting both as an employer *and* plan fiduciary under these circumstances.  There also is no evidence that Browning relied on representations made by individuals who lacked authority to communicate as fiduciaries with plan beneficiaries.  The court therefore concludes that EBE qualifies as an ERISA fiduciary under 29 U.S.C. § 1002(21)(A).

### b.    Did EBE breach its fiduciary duty to inform?

"[I]n certain circumstances, a fiduciary has an obligation to accurately convey material information to beneficiaries, including material information that the

23

beneficiary did not specifically request." *Watson v. Deaconess Waltham Hospital*, 298 F.3d 102, 114 (1st Cir. 2002) (citing *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 380-81 (4th Cir. 2001); *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000); *Harte v. Bethlehem Steel Corp.*, 214 F.3d 446, 452 (3rd Cir. 2000); *Krohn v. Huron Memorial Hospital*, 173 F.3d 542, 547-48, 550 (6th Cir. 1999); *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995); *Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747, 750-52 (D.C.Cir. 1990)).

According to the Fourth Circuit, "[a]n ERISA fiduciary that knows or *should know* that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent — especially when that misunderstanding was fostered by the fiduciary's own *material* representations *or omissions*." *Griggs*, 237 F.3d at 381 (emphasis supplied). The First and Ninth Circuits are in accord. *See Watson*, 298 F.3d at 114-15 (duty to inform under ERISA arises "if there was some particular reason that the fiduciary should have known that his failure to convey the information would be harmful"); *Mathews v. Chevron Corporation*, 362 F.3d 1172, 1183 (9th Cir. 2004) (ERISA fiduciary is obligated to convey information that it "should have known"). *Cf. Krohn*, 173 F.3d at 547 (an ERISA "fiduciary breaches its duties [to inform] by materially misleading plan participants, regardless of whether the fiduciary's statements or omissions were made

negligently or intentionally").

While the Eleventh Circuit has not yet decided whether an ERISA fiduciary may be liable for failing to convey information that it should have known, this court believes that the Circuit, if squarely presented the question, would so hold.

ERISA states, in relevant part, that "a fiduciary shall discharge his duties with respect to a plan . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

"[T]he Supreme Court has found that 'Congress intended by [this prudent man standard of care] to incorporate the fiduciary standards of trust law into ERISA.'" *Jordan v. Federal Express Corporation*, 116 F.3d 1005, 1015 (3rd Cir. 1997) (quoting *Massachusetts Mutual Life Insurance Company v. Russell*, 473 U.S. 134, 152-53 (1985)).

The law of trusts states that a trustee, "in dealing with the beneficiary on the trustee's own account," is "under a duty to communicate to the beneficiary all material facts in connection with the transaction which the trustee knows *or should know*." *Restatement (Second) of Trusts* § 173 cmt. d (1959) (emphasis supplied).

The Eleventh Circuit also "has recognized that '[t]he responsibility attaching

to fiduciary status has been described as 'the highest known to law.'"  *Jones v. American General Life and Accident Insurance Company*, 370 F.3d 1065, 1071 (11th Cir. 2004) (brackets in original) (quoting *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003) (in turn quoting *Herman v. Nationsbank Trust Company*, 126 F.3d 1354, 1361 (11th Cir. 1997)).

The evidence establishes that EBE (and Nelson) did not know that Mr. Browning would lose his life insurance coverage as a result of his reduced work schedule.  Even so, EBE and Nelson *should have known* this information, and, advised Browning accordingly.[23]

Here, neither EBE nor its president and CEO, Nelson, attempted to ascertain whether Mr. Browning would retain life insurance coverage despite his reduced work schedule.  Several factors make this omission particularly troublesome.  EBE (and Nelson) knew that Mr. Browning was terminally ill, and that the retention of life insurance coverage was of paramount importance to him and his wife, plaintiff herein. Nevertheless, EBE (acting through Nelson) implicitly (if not explicitly) advised

---

[23] This court could not locate authority defining the phrase "should know" in the context of trust instruments, but observes that both the *Restatement (Second) of Agency* and the *Restatement (Second) of Torts* define those words, and finds those authorities to be instructive.  In the law of agency, "[t]he words 'should know' express the idea that the person of whom they are spoken has a duty to others to ascertain facts or, if he does not ascertain them, to act with reference to the likelihood that such facts exist."  *Restatement (Second) of Agency* § 9 cmt. e (1958).  The term is given similar meaning in the law of torts.  *See Restatement (Second) of Torts* § 12 cmt. a (1965) ("'Should know' indicates that the actor is under a duty to another to use reasonable diligence to ascertain the existence or non-existence of the fact in question and that he would ascertain the existence thereof in the proper performance of that duty.").

Browning that he needed to take no further action to secure his benefits, without consulting Fortis to ask whether this was indeed so.  The court finds that EBE breached its fiduciary duty to inquire and inform Mr. Browning regarding material terms of the EBE plan.

### c.    Causation

Even where a breach of fiduciary duty occurs, the plaintiff must establish that the breach was the proximate cause of the loss claimed.  The court finds that this requirement is satisfied.  Browning knew that he was terminally ill, and wished to continue his life insurance coverage for the benefit of his widow.  It is more probable than not that Mr. Browning would have converted his policy to "individual" status, so as to maintain his insurance up to the time of his death, but for EBE's failure to inquire and inform him of that opportunity.

### d.    ERISA remedies

"The civil enforcement scheme of [§ 29 U.S.C. § 1132(a)] is one of the essential tools for accomplishing the stated purposes of ERISA."  *Pilot Life Insurance Company v. Dedeaux*, 481 U.S. 41, 52 (1987).[24]  This section provides, in relevant part, that a civil action may be brought:

---

[24] The civil enforcement scheme is sandwiched between 29 U.S.C. § 1131, which authorizes criminal penalties for violation of the reporting and disclosure provisions of ERISA, and 29 U.S.C. § 1133, which requires, among other matters, every employee benefit plan to comply with certain Department of Labor regulations. *See Pilot Life Insurance Company v. Dedeaux*, 481 U.S. 41, 52-53 (1987).

**(1)** by a participant or beneficiary —

. . . .

> **(B)** to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

**(2)** by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; [or]

**(3)** by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

29 U.S.C. § 1132(a)(1)-(3).

Plaintiff may not proceed under the first subsection, 29 U.S.C. § 1132(a)(1)(B). As of July 31, 1997, Browning was no longer covered under the terms of the EBE plan and, therefore, had no benefits due to him or his beneficiaries "under the terms of [that] plan." *See Varity*, 516 U.S. at 515 (holding that, where former employer misled plaintiffs to drop their old employee benefit plan, plaintiffs "could not proceed under the *first* subsection [*i.e.*, 29 U.S.C. § 1132(a)(1)(B)] because they were no longer members of the Massey-Ferguson plan and, therefore, had no 'benefits due [them] under the terms of [the] plan'") (emphasis in original) (second and third alterations in original).

Plaintiff also may not proceed under the second subsection, 29 U.S.C. §

1132(a)(2), because that provision, tied to 29 U.S.C. § 1109, does not provide a remedy for individual beneficiaries. *See Varity*, 516 U.S. at 515 (citing *Massachusetts Mutual Life Insurance Company v. Russell*, 473 U.S. 134, 144 (1985)).[25]

The pivotal question, therefore, is whether plaintiff may seek relief under the third subsection, 29 U.S.C. § 1132(a)(3).

In *Varity*, the Supreme Court held that an ERISA plan beneficiary may seek "appropriate *equitable* relief" under 29 U.S.C. § 1132(a)(3) to redress a breach of fiduciary duty. 516 U.S. at 515 (emphasis supplied). A beneficiary may not, however, seek *legal* relief under this provision. *See, e.g., Great-West Life & Annuity Insurance Company v. Knudson*, 534 U.S. 204, 221 (2002) ("Because petitioners are seeking legal relief . . . [29 U.S.C. § 1132(a)(3)] does not authorize this action.").

Without question, if Mr. Browning were still alive, reinstating his membership in the EBE Plan would be an appropriate equitable remedy. *See Mertens v. Hewitt*

---

[25] The cross-referenced provision, 29 U.S.C. § 1109, provides as follows:

(a) Any person who is a fiduciary with respect to a *plan* who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such *plan* any losses to the *plan* resulting from each such breach, and to restore to such *plan* any profits of such fiduciary which have been made through use of assets of the *plan* by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

29 U.S.C. § 1109(a) (emphasis supplied). In *Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134 (1985), the Supreme Court stated that § 1109(a) was "primarily concerned with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary." *Id.* at 141.

*Associates*, 508 U.S. 248, 255 (1993) (injunction would qualify as equitable relief under 29 U.S.C. § 1132(a)(3)).  The difficulty is that plaintiff is seeking *monetary* damages.  Whether plaintiff may recover from EBE, therefore, turns on whether her claim qualifies as "equitable relief."

"The Supreme Court has declined to hold that any award of monetary relief must necessarily be legal relief." *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1524 (11th Cir. 1991) (citing *Curtis v. Loether*, 415 U.S. 189, 196 (1974)).  "[T]he primary exception to the general rule is that damages are equitable when they are restitutionary, such as in action[s] for disgorgement of improper profits." *Waldrop v. Southern Company Services, Inc.*, 24 F.3d 152, 157 (11th Cir. 1994) (quoting *Chauffers, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990) (in turn quoting *Tull v. United States*, 481 U.S. 412, 424 (1987)) (internal quotation marks omitted).[26]

"Restitution is an equitable remedy designed to restore to a plaintiff something of value *that is wrongfully in the possession of another*."  *First National Life Insurance Company v. Sunshine-Jr. Food Stores, Inc.*, 960 F.2d 1546, 1553 (11th Cir. 1992) (emphasis supplied) (citing *Restatement (Second) of Restitution* § 1) ("A person who has been unjustly enriched at the expense of another is required to make

---

[26] The other exception is when damages are incidental to or interwined with injunctive relief. *See Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1525 (11th Cir. 1991).  This exception is inapplicable to this case because plaintiff does not seek injunctive relief.

restitution to the other.")).  "[A] plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession."  *Great-West Life & Annuity Insurance Company v. Knudson*, 534 U.S. 204, 214 (2002) (emphasis deleted) (citations omitted).  "Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property *in the defendant's possession*."  *Id.* at 215 (emphasis supplied).

The Eleventh Circuit's decision in *First National* is illustrative.  In that case, the First National Life Insurance Company ("insurance provider") issued a group insurance policy which was used to fund an employee welfare benefit plan established by Sunshine-Jr. Food Stores, Inc. ("the employer"), for the benefit of its employees. 960 F.2d at 1548.  According to the insurance provider, the employer erroneously certified that three of its employees were eligible for benefits and, as a result, the insurance provider overpaid a total of $40,000 to those employees.  *Id.* at 1552.  The insurance provider sought to recover that sum from the employer under § 1332(a)(3). The district court held, however, that while the insurance provider might seek restitution from the *employees who had actually received the overpayments*, it could

31

not seek restitution from the employer.  *Id.* at 1553.  The Eleventh Circuit affirmed.

Likewise, in this case, plaintiff cannot seek restitution from defendant EBE, because

it neither received nor retained the life insurance benefits claimed by plaintiff.  Fortis

(the insurance provider) retained that sum.  If plaintiff is to seek restitution, it must be

from Fortis, and no other defendant.

In sum, the court concludes that defendant EBE (acting through Nelson) was

a fiduciary to Mr. Browning when it assured him that he would retain his insurance

coverage.  The court also finds that EBE breached its fiduciary duty to ascertain

whether this assurance was founded.  Even so, plaintiff may not seek equitable

restitution from EBE and, therefore, a monetary claim under § 1132(a)(3) must be

denied.

"[T]he detailed provisions of [§ 1132(a)] set forth a comprehensive civil

enforcement scheme that represents a careful balancing of the need for prompt and fair

claims settlement procedures against the public interest in encouraging the formation

of employee benefit plans."  *Pilot Life Insurance Company v. Dedeaux*, 481 U.S. 41,

54 (1987).  "The deliberate care with which ERISA's civil enforcement remedies were

drafted and the balancing of policies embodied in its choice of remedies argue

strongly for the conclusion that ERISA's civil enforcement remedies were intended

to be exclusive."  *Id.*  Simply, this court may not grant relief to plaintiff when ERISA

does not permit it.

### 2.   Insurance provider (Fortis)

Fortis retained the $75,000 in life insurance benefits which plaintiff claims is due to her.  Even so, the evidence of record establishes that Fortis was not aware that Browning had ceased full-time employment until Nelson filed a claim for insurance benefits on plaintiff's behalf.  Accordingly, the court concludes that Fortis did not act (and could not have acted) in the capacity of a fiduciary on July 31, 1997, when EBE (acting through its President and CEO, Nelson) made the decisions which resulted in the termination of Browning's insurance coverage.  There is no basis, therefore, for holding Fortis liable on this basis.

### 3.   EBE president (George Nelson)

Plaintiff does not assert any grounds for holding George Nelson, President and CEO of EBE, personally liable.  The court finds that, even if plaintiff could pass this initial hurdle, she may not seek monetary relief from Nelson under ERISA for the same reasons discussed above.  Plaintiff's claim against George Nelson therefore is unavailing.

## III. CONCLUSION

The facts of this case are far more than just regrettable.  The court is sensitive to plaintiff's loss, which is far greater than the monetary sum at issue in this action.

The question presented to this court, however, is whether EBE, Fortis, or George Nelson, or any or all of the three defendants, should pay plaintiff $75,000 in life insurance benefits.  At least under ERISA, the answer must be no.  An appropriate order will be entered.

DONE this 29th day of April, 2005.

_____
United States District Judge